Hon. William C. Hennessy Commissioner Department of Transportation
Attached is the opinion of the Advisory Committee on Ethical Standards, which was prepared after the Committee conducted a lengthy and detailed review of the questions in your letter of April 23, 1979.
I hereby adopt as my formal opinion the Committee's advisory opinion in this matter.
October 16, 1979
The Honorable Robert Abrams Attorney General State of New York Department of Law Two World Trade Center New York, New York 10047
Dear Mr. Attorney General:
By letter dated April 23, 1979, W.C. Hennessy, Commissioner of the New York State Department of Transportation, requested an investigation to determine if any offense occurred relative to a possible conflict of interest in the award of a contract for so-called "wrap-up" insurance to Niagara Insurance Administration, Inc. (NIA) by the Niagara Frontier Transportation Authority (NFTA) in connection with the Light Rail Rapid Transit Project.
The matter was referred to the Advisory Committee on Ethical Standards, which has conducted an extensive investigation of the underlying facts and the events leading up to the award of the contract. Members of your staff have provided extremely valuable assistance in this investigation, particularly in the taking of depositions from the various parties in interest relating to questions suggested by Committee member John T. Smythe who generously took primary reponsibility for the initial inquiries in behalf of the Committee.
The fact situation out of which arises the allegation of unethical conduct revolves around the evaluation of proposals of the various insurance groups that submitted proposals for the insurance required in connection with the Light Rail Rapid Transit Project.
NIA, the insurance group which was awarded the contract for "wrap-up" insurance, listed James F. Thompson as Director of Insurance in their proposal and subsequently hired him as Director.
Prior to assuming that position, Thompson had been employed in 1976 by MARTA, a joint venture of Atlanta, Georgia insurance brokers furnishing insurance and risk management services to the Metropolitan Atlanta Rapid Transit Authority. He held the position of Insurance and Claims Manager until 1978 when he went to work for the Metropolitan Atlanta Rapid Transit Authority. There and at MARTA Thompson's immediate superior was Earl Novell.
From time to time after July 1978 Earl Novell was used by NFTA as a special consultant. On September 14, 1978, NFTA circulated a Request for Proposal, Insurance Administrator. Novell advised NIA that Thompson, along with others also named, would be qualified as a potential director of the project. Novell was one of the three evaluators for each of the three proposals submitted. The other two evaluators were Marion K. Henderson and Theodore B. Beck, both members of the staff of NFTA. The three proposals came from (1) NIA, a joint venture composed of Alexander and Alexander, Inc., Lawley Service, Inc., Clyde T. Farrell Agency and Henry Holland, Inc.; (2) the James, Gow, Gist Joint Venture; and (3) M. McClellan.
NIA received the highest recommendation by the evaluators, and NFTA was prepared to award the contract to NIA. However, the award has been suspended pending a decision as to whether there were irregularities in the process by which the award was determined.
A major consideration in rating NIA's proposal above that of James, Gow, Gist Joint Venture, which was rated second, was that the James Group named no proposed personnel for the project in its written submission, whereas NIA had so identified the personnel it proposed to employ, including as Director James Thompson, whose background and experience were favorably noted. However, Thompson testified that, although he had authorized NIA to use his name in the proposal, he had not made up his mind to accept if NIA received the contract. He testified that he had advised Novell to the same effect. But Novell testified that he was not aware that Thompson had not agreed to accept the position as Director; in fact, Novell claims not to have discussed the Project with Thompson after NIA discussed the position with Thompson.
The Ethics Advisory Committee has considered three questions arising out of these transactions as follows:
1. Was Earl Novell, acting as consultant to NFTA, an officer of employer of a state agency within the meaning of section 74 of the New York State Public Officers Law? We answer in the affirmative.
Section 74, entitled Code of Ethics, defines its reach in relevant part as follows:
 1. Definition. As sued in this section: The term "state agency" shall mean any state department, or division, board, commission, or bureau of any state department.
. . . .
 2. Rule with respect to conflicts of interest. No officer or employee of a state agency, member of the legislature or legislative employee should have any interest, financial or otherwise, direct or indirect, or engage in any business or transaction or professional activity or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest.
NFTA is a public authority, a category not specified within the coverage of section 74(1) of the Public Officers Law. However, we are satisfied that public authorities are within the intended coverage of "state agency." Such authorities are created by the legislature and serve significant public purposes. It is important to the state and to the public that the officers and employees of such bodies be bound to the same high ethical standards as officers and employees of more conventional state agencies. Accordingly, we conclude that Earl Novell, as consultant for NFTA, was an employee of a state agency at the time of the events in question, insofar as the application of the Ethics Code is concerned.
2. Did Earl Novell violate the standards of section 74 of the Public Officers Law in acting as an evaluator of a proposal that included the name of his subordinate, whose name he had suggested as a possible candidate? We answer in the negative.
Section 74(3) provides in pertinent part as follows:
 e. No officer or employee of a state agency, member of the legislature or legislative employee should engage in any transaction as representative or agent of the state with any business entity in which he has a direct or indirect financial interest that might reasonably tend to conflict with the proper discharge of his official duties.
 f. An officer or employee of a state agency, member of the legislature or legislative employee should not by his conduct give reasonable basis for the impression that any person can improperly influence him or unduly enjoy his favor in the performance of his official duties, or that he is affected by the kinship, rank, position or influence of any party or person.
. . . .
 h. An officer or employee of a state agency, member of the legislature or legislative employee should endeavor to pursue a course of conduct which will not raise suspicion among the public that he is likely to be engaged in acts that are in violation of his trust.
The "wrap-up" insurance segment of the insurance business is specialized, particularly in its relations with the few rapid transit projects in the country. The relatively few participants in the field tend to know each other. Accordingly, the Committee does not believe it improper for Novell to have suggested several potential candidates for project director to NIA, including his own subordinate, Thompson. Similarly, in the absence of any evidence that Novell sought to exert undue influence upon his fellow-evaluators because Thompson's name was on the NIA proposal, the Committee sees no need for Novell to have disqualified himself from acting as evaluator. It seems probable that any competent evaluator would know many of the individuals or organizations involved in submissions.
More troublesome is a question left unresolved because of apparent conflicts in testimony. As previously noted, Thompson asserts that he advised Novell that Thompson had not made a firm commitment to accept employment by NIA if the contract should be awarded to NIA. Novell denies that he was aware of anything outside the propsoal itself. Since the prospective availability of Thompson to the successful bidder was an important factor in the recommendation of all three evaluators, it would have been improper for Novell to withhold relevant information about Thompson known to him but not to the other evaluators or to NFTA and would have exposed him to possible criticism. In view of the conflict in the evidence between Thompson and Novell as to whether Novell knew that Thompson had not made a definite commitment, we cannot make a conclusive determination on this point. Despite our intensive investigation we have been unable to conclude that Novell violated any of the standards of Public Officers Law Section 74.
3. The request for an opinion by Commissioner Hennessy is met by the answers above outlined. However, in the course of the investigation another question was raised which should be noted. The question is this: if NFTA's request for proposals called for a firm commitment of personnel to be employed after award of a contract, was NIA guilty of any offense in submitting the name of Thompson who had not committed himself to a final decision in favor of employment by NIA?
Definitive answer to the question is not possible since it is not clear that the request for proposals asked for more than a statement of individuals who had agreed to consider employment, as was the case with Thompson. That seems a reasonable interpretation to put on the request for proposal since even a favorable recommendation by the evaluators does not assure success in the eventual contract award. It would accordingly be unlikely for an individual to make a flat commitment to so speculative a venture.
In any event, the Committee simply raises, but does not answer the question for the additional reason that the matter is outside the jurisdiction of the Advisory Committee on Ethical Standards. NIA is not a state agency within the meaning of section 74. Therefore, if NIA is chargeable with wrongdoing of any kind, which the Committee does not assert, the decision would have to come from some other body than this Committee.
Sincerely,
Robert B. McKay